**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | **Chapter 13** |
| **KAMEELAH  MU'MIN,** | : | |
| | : | |
| **Debtor** | : | **Bky. No. 06-12354ELF** |

# O P I N I O N

**BY**: **ERIC L. FRANK, United States Bankruptcy Judge**

## I.  INTRODUCTION

Presently before the court is the "Debtor's Motion for Contempt Pursuant to 11 U.S.C. §362(k) of the Bankruptcy Code" ("the Motion") filed by Debtor Kameelah Mu'min ("the Debtor").   The respondent is the University of Pennsylvania ("Penn").

To decide the Motion, I must determine whether a university's refusal to provide a transcript to a debtor, due to the existence of an unpaid, student loan debt that is nondischargeable under 11 U.S.C. §523(a)(8), violates the automatic stay provision of the Bankruptcy Code, 11 U.S.C. §362(a)(6).

For the reasons set forth below, I find that Penn has violated the automatic stay. Consequently, I will enter an order directing Penn to provide the Debtor with a certified copy of her college transcript upon payment of any customary fees.  In addition, I hold that regardless whether the facts giving rise to Penn's asserted "good faith" would have constituted a defense to monetary liability under the standard set forth in by the Court of Appeals in In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992), after the 2005 amendments to the Bankruptcy Code, Penn's defense is no longer legally viable.  Therefore, upon the filing of an appropriate

1

motion, I will award the Debtor the actual damages that she has requested, namely, reasonable

attorney's fees incurred for successful prosecution of the Motion.


## II. PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.

On December 15, 2006, the Debtor filed the Motion.  (Docket Entry No. 49).  Penn filed

a response to the Motion on January 9, 2007. (Docket Entry No. 53).  A hearing on the Motion

was held and concluded on January 23, 2007.  At the hearing, the parties submitted a written

stipulation of facts.  See Joint Exhibit #1.  In addition, the parties agreed to supplement the fact

stipulation with four (4) exhibits, specifically certain letters exchanged by counsel for the parties

between December 4, 2006 and December 11, 2006.  See Notes of Testimony 22-24 ("hereinafter

"N.T.").[1]  Following the hearing on January 23, 2007, I took the matter under advisement

pending the submission of post-hearing memoranda from the parties.  Both parties submitted

memoranda.

The record reveals the following pertinent facts.[2]

_____

[1]    Although it is clear that counsel agreed to the admissibility of the letters
referenced above in the text and they were received by the court, they were not specifically
marked as exhibits during the January 23, 2007 hearing.  To correct this oversight, by Order
dated August 3, 2007, the court belatedly marked the unmarked exhibits as Joint Exhibits #2
through #5.  See Docket Entry No. 86.

[2]    In my recitation, I will make reference to certain facts gleaned from the docket
and the documents filed in the Debtor's bankruptcy case.  I may take judicial notice of the
dockets and the content of the documents filed in the case for the purpose of ascertaining the
timing and status of events in the case and facts not reasonably in dispute.  See Fed. R. Evid. 201;
In re Scholl, 1998 WL 546607, at *1 n.1 (Bankr. E.D. Pa. Aug. 26, 1998);  See also In re Indian
Palm Assocs., Ltd., 61 F.3d 197, 205 (3d Cir. 1995).

**B.**

Between 1997 and 2001, the Debtor was a student at Penn.[3] She financed her education,

at least in part, through student loans granted or guaranteed by Penn. The principal amount of

the loans was in excess of $33,000.[4] The record does not reveal if or when the Debtor graduated

Penn, but given her efforts to obtain a transcript for graduate school applications giving rise to

this contested matter, it seems likely that the Debtor received an undergraduate degree, either

from Penn or another institution. The Debtor became delinquent in the repayment of her Penn

student loans on April 20, 2004. Her last payment on those loans was made on May 11, 2004.

Her transcript has been "on official hold" since April 20, 2004. Joint Exhibit #1 ¶¶10-11.

The Debtor first sought bankruptcy relief in a prior chapter 13 case filed on June 21, 2005

and docketed as Bky. No. 05-18584. The prior bankruptcy case was designed, in large part, to

permit the Debtor to cure a mortgage delinquency and prevent a foreclosure against her

residential property. The Debtor's plan was confirmed by Order dated January 24, 2006, but the

case was dismissed on April 11, 2006 due to the Debtor's failure to make plan payments.

---

[3]        Nothing in the stipulated record specifies the precise beginning and end dates of
the Debtor's attendance at Penn. However, Penn's proof of claim (in the amount of $59,302.99)
states that the debt was incurred in 1997-2000. Also, attached to the proof of claim are a series
of loan notes bearing what would appear to be the Debtor's signature in favor of PNC Bank
pursuant to "the PENN Guaranteed Loan Program" as well as a separate promissory note payable
directly to Penn. The Debtor has not objected to Penn's proof of claim and, therefore, the claim
has been allowed. See 11 U.S.C. §502(a). The notes attached to the proof of claim are dated
between May 22, 1997 and September 27, 2000. Since the last note signed was apparently for
the 2000-01 academic year, it is reasonable to infer from the documents attached to the proof of
claim that the Debtor attended Penn between 1997 and 2001.

[4]        There are seven (7) such notes dated between May 22, 1997 and September 27,
2000 written under the PENN Guaranteed Loan Program in principal amounts that aggregate
$32,092. In addition, attached to Penn's proof of claim is a promissory note in favor of Penn
dated August 31, 2000 in the amount of $1,500.00.

3

The Debtor filed the present chapter 13 bankruptcy case on June 6, 2006. Originally, she intended to make another effort to cure the prepetition mortgage delinquency on her home mortgage, see Debtor's Chapter 13 Plan ¶¶5-6 (Docket Entry No. 4), but she later changed course. Her Fifth Amended Chapter 13 Plan, which was confirmed by Order dated June 5, 2007 (Docket Entry No. 81), provides for the surrender of the Debtor's residential real property and for the Debtor to make thirty-six (36) monthly plan payments to the Chapter 13 Trustee totaling $8,650.00. Her plan payments are to be distributed on a pro rata basis to her unsecured creditors after payment of administrative expenses. See Fifth Amended Plan (Docket Entry No. 72).

In her bankruptcy schedules, the Debtor listed $96,034.69 in unsecured nonpriority debt. At the time the Motion was filed, unsecured claims totaling $66,783.15 had been filed, of which Penn's $59,302.99 claim was by far the largest.[5] The Debtor concedes that her debt to Penn is nondischargeable. Joint Exhibit #1 ¶5; see 11 U.S.C. §523(a)(8).

## C.

On October 3, 2006, several months after the filing of the present chapter bankruptcy case, the Debtor requested that Penn provide her with a certified copy of her transcript so that she could apply to a masters degree program in clinical psychology commencing in the fall of 2007.

---

[5]      As of the date of confirmation, two (2) separate claims secured by the Debtor's residence were filed. These two (2) claims totaled $263,606.93. The Debtor's confirmed plan provides for those claims through the surrender of the secured property. See 11 U.S.C. §1325(a)(5)(C). On August 14, 2007, presumably because a sale of the property had occurred resulting in no payment to the junior lienholder, one of the two claimants (TRF Enterprise Fund, Inc.) filed an amended proof of claim to change its claim from a secured claim to an unsecured claim. No objection to the amended claim has been filed. Consequently, the allowed unsecured claims now total $169,092.51 (as opposed to the $66.783.15 in allowed unsecured claims as of the date of confirmation).

4

See Joint Exhibit #1 ¶12.  The Debtor's request was referred to counsel for Penn.  See id. ¶13.

Thereafter, the Debtor's counsel corresponded with Penn's counsel in an effort to obtain the transcript.  See id. ¶3; Joint Exhibit #2.[6]  During a one week period between December 4 and 11, 2006, the Debtor's counsel sent three (3) letters to Penn's counsel.  See Joint Exhibits #2, #3, and #5.  In these letters, one dated December 4, 2006 and two dated December 11, 2006, the Debtor's attorney:

- explained that the Debtor intended to apply to two graduate schools (Temple University and Chestnut Hill College);

- requested that Penn mail her college and graduate transcripts to the two graduate schools;

- communicated the Debtor's willingness to pay for the cost of the transcript;

- advised Penn's counsel that the Debtor "needs these transcripts mailed out to these institutions immediately" due to a December 15, 2006 "application deadline";[7]

- stated that a refusal to give the Debtor a copy of her transcript "solely due to her account delinquency" was a "direct violation of the automatic stay";

- confirmed his understanding that Penn "refuses to surrender [the Debtor's] transcript"; and

- advised Penn's counsel of the Debtor's intent to file a contempt petition seeking attorney's fees and a fine if Penn failed to make the transcript available by December 13, 2006.

---

[6]    Joint Exhibit #2 is a letter from the Debtor's counsel to counsel for Penn dated December 4, 2006.  However, it makes reference to a prior letter from Debtor's counsel dated October 16, 2006.

[7]    It is not obvious to me that an "application deadline" necessarily is a deadline for the delivery of all information supporting a graduate school application–material such as recommendations and transcripts.  In any event, it is apparent that the Debtor believed that there was some urgency to the delivery of the transcripts and her counsel communicated her concerns to Penn's counsel.

There is no dispute that Penn did not provide the Debtor with a certified copy of her transcript in response to her request. Joint Exhibit #1 ¶4.  Penn has an official, written policy that student loan transcripts will not be released if there is a defaulted student loan, id. ¶7, at least "without payment or payment arrangement." Id. ¶6.[8]  In his letter in response to one of the Debtor's counsel's December 2006 letters, Penn's counsel stated that Penn's "policy [is] to put a transcript hold on accounts that are delinquent."  However, he denied that Penn "attempted to collect a debt after being notified [that the Debtor] was in bankruptcy."  See Joint Exhibit #4.

## III.  DISCUSSION

### A.  *The Automatic Stay – General Principles*

The automatic stay under §362(a) of the Bankruptcy Code "'is one of the fundamental debtor protections provided by the bankruptcy laws.'"  H & H Beverage Distributors v. Dep't of Revenue, 850 F.2d 165, 166 (3d Cir. 1988) (quoting H.R. Rep. No. 595 at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6296)).  To provide the bankruptcy process with an opportunity "to resolve competing economic interests in an orderly and effective way," the automatic stay is designed to: (1) effectively stop all creditor collection efforts; (2) stop all harassment of a debtor seeking relief, and (3) maintain the status quo between the debtor and creditors.  Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999) (citation omitted).

---

[8]    While the parties have stipulated that such a written policy exists, the written policy itself was not made part of the record.

To accomplish these goals, §362(a) restrains a broad range of conduct, including the continuation of litigation,[9] the enforcement of prepetition judgments,[10] the creation or enforcement of liens against property of the estate[11] and, generally, any act to collect, assess, or recover a claim against the debtor that arose prepetition.[12]  See generally Delpit v. Comm'r, Internal Revenue Service, 18 F.3d 768, 772 (9th Cir. 1994) (observing existence of "substantial overlap" among the subsections of §362(a) derived from Congress's intent to comprehensively describe every action "that might impinge on the debtor's 'breathing spell,' even though such an approach might result in some redundancy").

Subsection (a)(6) provides that the filing of a petition operates to stay "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. §362(a)(6).   This language has been described as "extremely broad in scope and encompass[ing] any act to collect a pre-petition claim from a debtor."  Rosas v. Monroe County Tax Claim Bureau, 323 B.R. 893, 898 (Bankr. M.D. Pa. 2004).  "Given the important functions served by the automatic stay, the provisions of subsection (a)(6) have been broadly construed."  In re Sechuan City, Inc., 96 B.R. 37, 41 (Bankr. E.D. Pa. 1989) (citing numerous cases).

Generally, the automatic stay continues to operate until the time a discharge is granted or denied, pursuant to 11 U.S.C. §362(c)(2)(C).  In this case, the automatic stay was in effect and

---

[9]     11 U.S.C. §362(a)(1).

[10]    11 U.S.C. §362(a)(2).

[11]    11 U.S.C. §362(a)(4).

[12]    11 U.S.C. §362(a)(6).

applicable to Penn when the Debtor requested that Penn provide her with her college transcript.[13]

**B.  _Brief Survey of the Relevant Caselaw_**

**1.**

The issue whether an educational institution[14] violates the automatic stay by withholding

a debtor's transcript due to the existence of an unpaid student loan debt is heavily chartered

water.  The majority view, occasionally with some qualification, is that a university's refusal to

release a debtor's transcript due to the existence of a default on a nondischargeable student loan

owed to the university violates 11 U.S.C. §362(a)(6).[15]

---

[13]        Section 362(c)(3) provides that if a bankruptcy case is filed by an individual who
had a prior bankruptcy case dismissed (other than a dismissal under 11 U.S.C. §707(b)) within
the preceding one year period, the automatic stay terminates on the 30th day after the filing of the
later case, unless the stay is extended after notice and hearing.  In this case, §362(c)(3) was
applicable.  After notice and hearing, however, the court entered an order extending the
automatic stay.  See Docket Entry No. 17.

[14]        For ease of reference, I will refer to such an institution as a "university."

[15]        See, e.g., In re Merchant, 958 F.2d 738, 741 (6th Cir.1992) (holding that refusal to
provide chapter 7 debtor transcript because of default on student loan was a violation of the
automatic stay based on the plain language of 11 U.S.C. §362); In re Hernandez, 2005 WL
1000059, at *1 (Bankr. S.D. Tex. Apr. 27, 2005) (concluding that denial of transcript to chapter
13 debtor because of outstanding student loans was a violation of the automatic stay); Loyola
Univ. v. McClarty, 234 B.R. 387, 386 (E.D. La.1999) (university's act of withholding chapter 13
debtor's transcript violated automatic stay); In re Scroggins, 209 B.R. 727, 730 (Bankr. D. Ariz.
1997) (act of parochial school withholding transcript of chapter 13 debtor's minor child violated
the automatic stay); In re Carson, 150 B.R. 228, 231 (Bankr. E.D. Mo. 1993) (holding that
college violated stay by not delivering transcript to chapter 7 debtor when debt had not yet been
determined dischargeable);  In re Gustafson, 111 B.R. 282, 288 (9th Cir. BAP 1990), rev'd on
other grounds, 934 F.2d 216 (9th Cir.1991) (holding that university violated the automatic stay
by withholding chapter 7 debtor's transcripts because the debts were not yet determined
nondischargeable); In re Parham, 56 B.R. 531, 534 (Bankr. E.D. Va. 1986) (holding that

In this Circuit, however, two courts have veered from the majority view, one court, holding that a university's refusal to release a debtor's transcript due to an unpaid, nondischargeable student loan is not a violation of 11 U.S.C. §362(a)(6), see In re Billingsley, 276 B.R. 48 (Bankr. D.N.J. 2002), the other court holding that the conduct does not violate the automatic stay unless the debtor provides adequate protection for the university's "special interest" in the transcript, see In re Najafi, 154 B.R. 185, 187 (Bankr. E.D. Pa. 1993).  Indeed, Penn urges that I follow either Billingsley or Najafi.

In their respective analyses of the issue, the courts in Billingsley and Najafi both rely heavily on the Third Circuit's decision, Johnson v. Edinboro State College, 728 F.2d 163 (3d Cir. 1984).  Therefore, to resolve the issue before me, I find it necessary to review the caselaw and unpack the arguments, with Johnson as the appropriate starting point.

---

university violated automatic stay by withholding chapter 13 debtor's student transcript, but that such action at bar did not rise to the level of contempt).  See generally In re Parker, 334 B.R. 529, 536, 538 (Bankr. D. Mass. 2005) (concluding that university's act of refusing to allow chapter 7 debtor from registering for class and from graduation was both violation of the automatic stay and the discharge injunction); In re Walker, 336 B.R. 534, 536 (Bankr. M.D. Fla. 2005) (considering whether private university violated 11 U.S.C. §§362 and 525 by withholding chapter 13 debtor's transcript); In re Reese, 38 B.R. 681, 683 (Bankr. N.D. Ga. 1984) (holding that state university violated 11 U.S.C. §§362 and 525 by withholding debtor's transcript where debt was dischargeable); In re Ware, 9 B.R. 24, 25 (Bankr. W.D. Mo. 1981) (on objection to confirmation found that 11 U.S.C. §525 was inapplicable but that college violated automatic stay by denying transcript to chapter 13 debtor); In re Howren, 10 B.R. 303, 305 (Bankr. D. Kan. 1980) (on motion requesting order for immediate release of transcript, held that state university was in violation of 11 U.S.C. §§362 and 525 for withholding chapter 7 debtor's official transcript for purpose of debt collection);  In re Heath, 3 B.R. 351, 354-55 (Bankr. N.D. Ill. 1980) (state university act of refusing to issue academic record to chapter 13 debtor frustrated fresh start policies of the Bankruptcy Code and violated both 11 U.S.C. §§362 and 525).

**2.**

Decided over twenty years ago, <u>Johnson</u> involved a chapter 7 debtor who brought a

complaint to determine dischargeability under 11 U.S.C. §523(a)(8)[16] and complained that the

college withheld his diploma and denied his transcript, thereby jeopardizing his professional

development in violation of 11 U.S.C. §525.  At that time, §525 provided that a governmental

unit may not

> deny, revoke, suspend, or refuse to renew a license, permit, charter,
> franchise, or other similar grant to, condition such a grant to,
> discriminate with respect to such a grant against, deny employment
> to, terminate the employment of, or discriminate with respect to
> employment against, a person that is or has been a debtor under
> this title or a bankrupt or a debtor under the Bankruptcy Act, or
> another person with whom such bankrupt or debtor has been
> associated, **solely because such bankrupt or debtor** is or has
> been a debtor under this title or a bankrupt or debtor under the
> Bankruptcy Act, has been insolvent before the commencement of
> the case under this title, or during the case but before the debtor is
> granted or denied a discharge, or **has not paid a debt that is
> dischargeable in the case under this title** or that was discharged
> under the Bankruptcy Act.

---

[16]    When <u>Johnson</u> was decided, §523(a)(8) provided that "an educational loan made,
insured, or guaranteed by a governmental unit, or made under any program funded in whole or in
part by a governmental unit or a nonprofit institution of higher education" was nondischargeable
if <u>either</u>:

> (1) repayment of the student loan first fell due more than five (5)
> years before the filing of the bankruptcy case; or
>
> (2) excepting the debt from discharge would impose an undue
> hardship on the debtor.

In subsequent amendments to the Code, Congress first lengthened the five (5) year
nondischargeability reachback to seven (7) years and then eliminated it altogether, leaving
"undue hardship" as the only basis for the discharge of a §523(a)(8) debt. In 2005, Congress also
expanded the scope of the debts covered by §523(a)(8).  <u>See</u> 4 <u>Collier on Bankruptcy</u>
¶523.LH[3][a], at 523-140 to 143 (15th rev. ed. 2007).

<u>Johnson</u>, 728 F.2d at 165 n.3 (emphasis added).  The bankruptcy court determined that the loans did not pose an undue hardship under §523(a)(8), but ordered the college to turn over the diploma and transcript. After the district court affirmed, the Court of Appeals reversed the bankruptcy court decision.

The critical factor in the Court of Appeals' analysis was that the underlying debt at issue was nondischargeable.  The nondischargeability of the debt precluded the debtor from obtaining relief under the plain text of 11 U.S.C. §525.  Indeed, the court distinguished two bankruptcy court decisions[17] in which universities were ordered to provide transcripts to bankruptcy debtors on the basis that those cases were chapter 13 cases in which the debts were dischargeable,[18] stating,

> The distinction between [the two bankruptcy court decisions] and the case presented . . .  is patent: the debts owed by [the debtors in the other cases] were dischargeable and, in fact had been discharged; the debt Johnson owes Edinboro College is not dischargeable.  Consequently we can find no basis in the Bankruptcy Code to nullify [the college's] policy of withholding transcripts from those students who . . . have not had their debts discharged.

<u>Id.</u> at 166

<u>Johnson</u> was decided under §525 and nowhere even cites 11 U.S.C. §362.  Yet afterwards, some courts applied the decision to debtors' claims that a university's refusal to

---

[17]     <u>See</u> n.15, <u>supra</u> (citing the two (2) cases referenced in the text: <u>In re Ware</u> and <u>In re Heath</u>).

[18]     At that time, debts that were nondischargeable under 11 U.S.C. §523(a)(8) were dischargeable under §1328(a), the chapter 13 dischargeability provision.  <u>See Johnson</u>, 728 F.2d at 166 n.4; <u>see also</u> Pub. L. No. 101-650, 104 Stat. 5089 (1990) (adding §523(a)(8) debts to those debts nondischargeable under §1328(a)).

provide a transcript upon request violated §362(a), finding <u>Johnson</u>'s distinction regarding

nondischargeable debts to be outcome determinative under §362(a).  <u>See</u> <u>In re Gustafson</u>, 111

B.R. at 285 (where the debt is merely presumed but not yet judicially determined to be

nondischargeable, the automatic stay prevents university from refusing to provide transcript);

<u>Carson</u>, 150 B.R. at 231-32 ("Once a student loan has been determined to be not dischargeable, a

school may withhold . . . delivery of a debtor's transcripts as a means of collection.").

Essentially, the debtor only remained protected by the stay if there had not been a determination

that the underlying debt was nondischargeable.[19]

Other courts, however, have employed a plain reading of §362(a) to find a stay violation

occurs and that a determination of dischargeability is irrelevant if a university refuses to provide

a transcript upon request of a debtor during the pendency of the bankruptcy case.  <u>See</u> <u>Merchant</u>,

958 F.2d at 741-42 (holding that even though the credit extension was a nondischargeable debt

under §523(a)(8), the university violated the stay because educational debts are not one of the

listed exceptions found in §362(b)); <u>Hernandez</u>, 2005 WL 1000059, at *3 (holding that debts

declared or presumed nondischargeable remain subject to the automatic stay); <u>Parker</u>, 334 B.R. at

536 (holding that student debt declared nondischargeable remains subject to the automatic stay).

---

[19]    This type of analysis also led some courts to draw a distinction between chapter
13 and chapter 7 debtors in determining whether a stay violation occurred since, at the time those
cases were decided, student loan obligations were dischargeable under  11 U.S.C. §1328(a).  <u>See</u>,
<u>e.g.</u>, <u>Parham</u>, 56 B.R. at 533-34 (contrasting <u>Johnson</u>, a chapter 7 case, to the chapter 13 case at
bar to find that a debtor who develops a schedule of payments as part of a good faith effort will
receive a discharge of that debt upon successful completion of the confirmed plan); <u>Reese</u>, 38
B.R. at 683 (holding that a chapter 13 debtor should be able to obtain a copy of his transcript in
light of the broader discharge provision of chapter 13).

**3.**

In <u>Billingsley</u> and <u>Najafi</u>, the two reported bankruptcy court decisions in this Circuit

mentioned above, the courts held that a university's act of withholding a transcript from a student

debtor did not violate the automatic stay, reasoning that the result was mandated by <u>Johnson</u>.

<u>See</u> <u>Billingsley</u>, 276 B.R. at 51; <u>Najafi</u>, 154 B.R. at 193.  Both courts explained that although

<u>Johnson</u> was a decision under §525, the rationale for permitting a university to retain a debtor's

transcript notwithstanding the fresh start policy of §525 applied as well under §362(a) with

respect to a nondischargeable student loan that is in default.[20]

<u>Billingsley</u> also concluded that even if <u>Johnson</u> were not controlling, the stay was not

violated due to the contractual nature of the relationship between the debtor and the university.

<u>Billingsley</u>, 276 B.R. at 53. Citing to the Supreme Court's decision in <u>In re Strumpf</u>, 516 U.S. 16

(1995),[21] the court found that the university's denial of the transcript was merely a refusal to

perform on a promise because the debtor failed to uphold her end of the bargain; it was not a

---

[20]    In its analysis, the <u>Billingsley</u> court also relied on the post-<u>Johnson</u> amendments
to §523(a)(8) that expanded the scope of that provisions exception to discharge.  <u>See</u> n.16, <u>supra</u>.

[21]    In <u>Strumpf</u>, the Supreme Court decided whether a creditor's temporary
withholding of a payment on a debt it owes to the debtor to protect its setoff rights violates the
automatic stay. 516 U.S. at 17.  <u>Strumpf</u> involved a chapter 13 debtor who had a checking
account at a bank, but also was in default on a loan with the same bank. <u>Id.</u> at 18. After filing for
bankruptcy, the bank placed an "administrative hold" on the debtor's checking account in that it
refused to pay withdrawals on it to protect the set off amount owed under the loan.  <u>Id.</u>  Five (5)
days after placing the hold, the bank filed a motion for relief from the stay in order to effect a
setoff.  <u>Id.</u>  The Court concluded that the initial, administrative "hold" on the account was not a
setoff because it was not a permanent reduction of the debtor's account balance.  <u>Id.</u> at 19.   The
Court also stated that the administrative hold did not violate §362(a)(3) or §362(a)(6) because the
"temporary refusal to pay was neither a taking of possession of respondent's property nor an
exercising of control over it, but merely a refusal to perform its promise." <u>Id.</u> at 21.  The Court
noted that such an interpretation under §362(a)(3) or §362(a)(6) would proscribe the ability of a
creditor to temporarily refuse to pay a debt subject to setoff, contrary to policies expressed in
§542(b) and §553(a) of the Code.  <u>Id.</u>

13

violation of the stay. Id. at 53-54.[22]  While the court acknowledged the large body of caselaw

holding that a college violates the stay by refusing to release the debtor's transcript, it noted that

only McClarty and Scroggins were decided after Strumpf and neither addressed the implications

of the Supreme Court's decision. Id. at 54-55.

In Najafi, the court expressed its deference to Johnson, but also discussed the respective

property rights of the debtor and the university in the transcripts.  While acknowledging that a

student debtor has certain property rights in his/her transcript, the court concluded that a college

_____

[22]  The court stated:

> The relationship between a university and a student is essentially
> contractual in nature. . . .  The contractual agreement between the
> parties, then, can be stated thusly: upon the debtor's enrollment,
> [the university] promised, inter alia, to create, maintain, and deliver
> a transcript reflecting the debtor's academic performance provided
> that the debtor fulfill certain obligations, including the timely
> repayment of student debt. . . .
>
> . . . .
>
> Similarly, [the university's] withholding of the debtor's transcript is
> merely a refusal to perform on a promise to create and deliver a
> record of the debtor's academic performance. Such conduct is
> wholly consistent with the very purpose of the automatic stay: "to
> maintain the status quo that exists at the time of the debtor's
> bankruptcy filing." . . .  Thus, if the debtor had not filed for relief
> under chapter 13, she would have no right to compel Temple
> University to perform on its promise to create and distribute her
> academic transcript. The debtor should not enjoy greater rights
> under her contract inside of bankruptcy than she would enjoy
> outside of bankruptcy. Thus, consistent with Strumpf, this court
> holds that Temple University's refusal to perform on its promise is
> not a violation of the automatic stay.

Billingsley, 276 B.R. at 53-54 (citations and footnotes omitted).

14

has a "special interest" in a transcript.  Najafi, 154 B.R. at 194.[23]  Treating the dispute in the

same manner employed in resolving motions for relief from the automatic stay brought by a

secured creditors, the court ruled that if the debtor paid the college a certain sum toward the

nondischargeble debt (albeit an amount less than the balance due on the defaulted student loan),

the college would be adequately protected and is obliged (and could be ordered) to provide the

transcript to the debtor.  Thus, while Najafi is supportive of Penn's position in this litigation

insofar as the decision suggests that no violation of the automatic stay took place, it also lends

some support to the debtor in that it provides authority for a court to order the delivery of the

transcript notwithstanding the debtor's failure to repay the nondischargeable debt.[24]


## 4.

One last preliminary point merits mention before I explain the basis for my decision.

Whatever division may exist among the courts as to whether a debtor is entitled to obtain a

transcript notwithstanding the existence of a defaulted nondischargeable student loan, there appears

to be a consensus on one point.  A university's refusal to provide the transcript upon request is an

---

[23] In Najafi, Judge Scholl analogized the transcript to that of a security interest.  Judge Scholl cited to two cases to support his proposition, both which were his own–In re Shapiro, 124 B.R. 974 (Bankr. E.D. Pa. 1991) and In re Ford, 78 B.R. 72 (Bankr. E.D. Pa 1987).  The third and final case cited, Juras v. Aman Collection Service, Inc, 829 F.2d 739 (9th Cir. 1987), was a not a stay violation case or in the bankruptcy context for that matter. Rather the case was brought under the Fair Debt Collections Practices Act, 15 U.S.C. §§1692 et seq. and the Ninth Circuit found that a college transcript was not security, but that the state university could withhold it from the debtor upon the debtor's default. As to the "security interest," the court concluded that the university owned the transcript, but that the debtor had a right of access to it. It supported its decision by citing to Johnson. 154 B.R. at 742-43.

[24] My research has not found any other decision which has been decided based on the "adequate protection" analysis employed by the Najafi court.

action designed to collect the unpaid debt.  See, e.g., Gustafson, 111 B.R. at 286-87 ("Withholding

of the transcript could serve no purpose other than to compel the repayment of the debt or

reaffirmation of the obligation.");  Parker, 334 B.R. at 536 ("[The university] cannot reasonably

argue that the act of not allowing [the debtor] to register for a class and for graduation was done for

any purpose other than to compel [the debtor] to pay her debt.");  Najafi, 154 B.R. at 194 ("The

refusal to supply transcripts is a logical response to a former student's failure to pay a bill, at least

until the bill is determined to be a dischargeable debt.");  Carson, 150 B.R. at 231 ("The act of

threatening to not confer the degree, and the act of threatening to not deliver the transcripts are . . .

acts to collect a debt that has not yet been determined to be non-dischargeable.");  Ware, 9 B.R. at

25 ("The facts indicate that the sole purpose of Avila College denying a transcript to the debtor is

a method used to force debt collection.");  Heath, 3 B.R. at 353 (finding that the university was

withholding the debtor's  transcript "for the sole purpose of compelling [the debtor] to pay a

prepetition debt").

        I have no difficulty endorsing the consensus view.   A school transcript has no intrinsic

economic value to a university.   Unlike traditional secured property, the transcript cannot be

liquidated to reduce the outstanding debt.  Its only value to the university is derived from its value

to the debtor.[25]   At the same time, the transcript's value to the debtor is potentially enormous.  In

modern society, higher education is frequently indispensable in achieving success and career

fulfillment.  See, e.g., Northampton County Area Community College  v. Dow Chemical, U.S.A.,

---

[25]     Cf., e.g., 2 Norton Bankruptcy Law and Practice 2d §46:25 (2007) (citing H.R.
Rep. No. 95-595 at 127 (1977) (Congress found that many consumer lenders took nonpossessory,
nonpurchase money security interests in consumer goods not for the value of the collateral to the
creditor, but because of the leverage such an interest would give the creditor to coerce repayment
from a debtor who could not afford to replace such goods following repossession).

598 A.2d 1288, 1294 (Pa. 1991); Com. ex rel. Brown v. Weidner, 220 A.2d 382, 385 (Pa. Super. Ct.

1966); Pass v. Pass, 118 So. 2d 769, 773 (Miss. 1960).  And, the transcript is indispensable in

obtaining access to advanced degrees in higher education.  Thus, wherever one comes out in

analyzing the nature of a transcript as "property" (i.e., is it property of the debtor  –  akin to the

records in the client file of a lawyer or the patient file of a doctor  –  or is it  property of the

university or a little of both?), it strikes me as self-evident that the university's decision to withhold

the transcript is simply a debt collection device whose only purpose is to compel payment of a debt.

Thus, the issue is not whether Penn has taken action to collect a debt by refusing to provide

the transcript, conduct which, on its face, violates the plain language of §362(a)(6), but rather

whether the judicial gloss given to §362(a)(6) requires the conclusion that the conduct falls outside

the scope of that subsection of  the automatic stay provision of the Code.

### C.  *Penn Violated the Automatic Stay*

#### 1.

I must first disagree with Penn's contention that Johnson controls in this matter for no other

reason than it was not decided under §362.   As explained in Hernandez:

> [Johnson] stands for the proposition that the non-discrimination
> provisions of §525 of the Bankruptcy Code do not prohibit a
> university from denying a transcript to a debtor who files under
> chapter 7 of the Bankruptcy Code instead of attempting in good faith
> to propose a chapter 13 repayment plan, whose debt is determined by
> the bankruptcy court to be non-dischargeable, and who has not made
> any approach to the college to arrange a more flexible repayment
> plan. [Johnson] does not stand for the proposition that an attempt to
> recover a debt during a chapter 13 case is not a violation of §362 of
> the Bankruptcy Code.

2005 WL 1000059, at * 2.  (emphasis added).

17

Rather, I agree with the plain reading of §362 and the analysis employed by <u>Merchant</u>, <u>Hernandez</u> and <u>Parker</u>.   Accordingly, I conclude that the automatic stay remains in effect, irrespective of a determination of dischargeability under §523(a)(8).

The Code sets forth express exceptions to the §362(a) automatic stay.  These exceptions are found in §362(b).  As explained in <u>Gustafson</u>, one of the exceptions set forth in §362(b) provides that the automatic stay does not apply to the "'the collection of alimony, maintenance, or support from property that is not property of the estate.'" 111 B.R. at 286.   Noting that such debts are excepted from discharge under §523(a)(5), the <u>Gustafson</u> court reasoned persuasively that "the conscious decision of Congress to make an express exception for one nondischargeable debt implies that Congress intended that collection of other nondischargeable debts be subject to the automatic stay." <u>Id.</u> Because the kind of debt excepted from discharge by §523(a)(8) is not expressly excepted from §362(a) by any provision of §362(b), it should not be precluded from such protection simply because the debt's nondischargeability has been conceded by the debtor or determined by the court. <u>See generally</u> <u>TRW, Inc. v. Andrews</u>, 534 U.S. 19, 28, 122 S.Ct. 441, 447 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent") (quoting <u>Andrus v. Glover Constr. Co.</u>, 446 U.S. 608, 616-617, 100 S.Ct. 1905 (1980)).

In addition, some courts have treated the entry of a §523 dischargeability determination as the functional equivalent of a "discharge" within the meaning of §362(c)(2)(C) and, thus treated the stay as terminated as to that specific debt. <u>See</u> <u>In re Embry</u>, 10 F.3d 401, 403(6th Cir. 1993).  I disagree with that analysis.

18

Section 362(c)(2) provides:

> the stay of any other act under subsection (a) of this section continues until the earliest of –
>
> (A)      the time the case is closed;
>
> (B)      the time the case is dismissed; or
>
> (C)      if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied.

In re Cardillo, 172 B.R. 146 (Bankr. N.D. Ga. 1994)[26] provides a thoughtful analysis, explaining that §362(c)(2)(C) does not terminate the automatic stay, even after a determination of dischargeability under §523(a)(8).  The court explained that a debtor, in the context of chapter 7,

> receives only one discharge or has one discharge denied: the discharge mentioned in section 727(a). Bankruptcy courts do not grant or deny "a discharge" piecemeal and do not grant or deny "discharges" to a debtor."  If a discharge is granted, section 524 imposes an injunction to provide the debtor post-petition protection from acts of creditors to enforce claims as the personal liability of the debtor.  If a discharge is denied, a judgment of nondischargeability of a particular debt gives a creditor no additional advantage.

172 B.R. at 151.   To further support its conclusion, the court approved the reasoning in In re Watson, 78 B.R. 267 (Bankr. C.D. Cal. 1987) wherein the court analogized a dischargeability judgment to the claims process in rejecting the proposition that a nondischargeabilty judgment

---

[26] Cardillo involved a chapter 7 debtor whose creditor obtained a judgment under §523(a)(6) based on state court judgment.  The creditor subsequently filed a continuing garnishment against the debtor's employer.  The debtor moved for contempt and the imposition of sanctions for violating the stay.  The creditor argued unsuccessfully that the stay should not apply to a holder of a §523 judgment because a general discharge under §727 does not discharge a debt not dischargeable under §523 and thus, it made no sense to require a creditor to wait until the general discharge is granted.

19

constitutes a denial of a discharge under §362(c)(2)(C).  See Cardillo, 172 B.R. at 150-51 (citing

Watson, 78 B.R. at 271).[27]

As originally explained in Watson by Judge Bufford,

> A declaratory judgment that a debt is not subject to discharge has
> no effect until the discharge is entered.  Prior to that time, it is like
> an engine that is idling.  The discharge puts the declaratory
> judgment into gear, and gives it effect.  This is exactly the time that
> section §362(c)(2)(C) terminates the automatic stay.

Watson, 78 B.R. at 271.

Cardillo also gave three policy reasons why its decision under §362(c)(2)(C) was sound.

First, it acknowledged that its decision was consistent with what it termed the "cooperation policy"

intended by the Bankruptcy Code.  Cardillo, 172 B.R. at 151-52. ("The cooperation policy of

encouraging collective action is one of the more important stratagems embodied in the Bankruptcy

Code, because it encourages efficiency in matters of common interest and is necessary to bring order

to the process."); see also Hernandez, 2005 WL 1000059, at * 3 ("If non-dischargeable debts were

not stayed, then creditors with non-dischargeable debts would wreck the liquidation of assets and

process of orderly payment of the estate's debts according to the statutory priorities.").   In other

words, if the stay did not apply to a creditor who obtained a favorable judgment under §523, such

creditor would get a head start on collection  –  precisely what the Bankruptcy Code was designed

to prevent so that creditors could share equally in the distribution of available assets.  Second,

---

[27]      In Watson, the court viewed a dischargeability judgment as being analogous to a
determination whether a claim should be allowed and, if allowed, the amount to be allowed.
Neither aspect of the claims resolution process involves the grant of relief from the automatic
stay.  Arguments by analogy can have their limitations and I do not necessarily endorse Watson's
characterization of nondischargeability judgments in its entirety.  The analogy does illustrate,
however, that a determination of nondischargeability bears no particular legal or logical relation
to the grant of relief from the automatic stay.

keeping the stay in place until the grant or denial of the general discharge provides greater protection

for the estate.  Cardillo noted, for instance, that a creditor unrestricted by the stay could compete with

a trustee in pursuit of property held by a fraudulent transferee.  Id. at 153.  And, third, if holders of

§523 judgments were exempt from the stay, it would encourage §523 actions where viable §727

actions exist so as to get a head start on collection.  Id.


## 2.

Having ruled out the application of Johnson and concluded that a plain reading of §362

favors a determination that the stay was in effect, what follows naturally is my disagreement with

Billingsley and its holding that a debt that is presumptively nondischargeable under §523(a)(8) is

outside the protection of the automatic stay.  Aside from its reliance on Johnson, Billingsley

overlooked a critical factor in Strumpf  –  that the administrative hold was only temporary and that

the creditor was still obliged to file a motion for relief from the stay.  Hernandez, 2005 WL 100059,

at * 2; see also Walker, 336 B.R. at 537 n.1.  Any application of Strumpf in the context of a refusal

to provide a transcript upon request suggests only that the university may be entitled to withhold the

transcript temporarily pursuant to school policy, but must seek relief under §362 to do so on a

permanent basis.

Before proceeding with a "plain language" application of §362(a), however, I cannot

overlook the spectre of the potential manipulation of the Bankruptcy Code posited by Judge Russell

in his dissent in Gustafson.  The concern raised is that if the stay protects debts that are deemed, or

even presumptively deemed nondischargeable, requiring a university to turn over the chapter 13

debtor's transcript arguably "turn[s] the law on its head" because a debtor could file a chapter 13

case, demand the transcript and then voluntarily dismiss the case under §1307 after receipt without

21

having filed a plan or making a payment.  111 B.R. at 289; see also Billingsley, 276 B.R. at 54 n.5

(citing to Gustafson, and stating that "a contrary holding – that the retention of a chapter 13 debtor's

transcript for failure to repay loans violates the automatic stay  –  would create a loophole for the

unscrupulous chapter 13 student-debtor").  In other words, the argument is that if the purpose of the

stay is to maintain the status quo, and the status quo outside of bankruptcy is to withhold the

transcript pursuant to university policy, why should the debtor be granted greater rights and be

entitled to the transcript upon the filing of a bankruptcy petition?  See generally In re Brown, 851

F.2d 81 (3d Cir. 1988) (credit union's notification to debtor of its policy of refusing to provide future

services to the debtor if she obtained discharge of credit union debt not a violation of automatic stay).

In Hernandez, Judge Steen acknowledged this concern and resolved it in a manner that I

find persuasive.  The solution is to treat the transcript requests as protected by the automatic stay,

but subject to the grant of relief under §362(d) to permit a university to resume debt collection

efforts by withholding the transcript.  Section 362(d) provides that on request of a party in

interest, and after notice and a hearing, the court shall grant relief from the stay for "cause."

As expressed in Hernandez, a university receiving a request for a transcript has a choice.

It must either provide the transcript to the debtor in the ordinary course or promptly file a motion

for relief from the automatic stay.  Treatment of a debtor transcript request in this manner is

consistent with: (1) the plain language of the Code and (2) the Supreme Court's decision in

Strumpf (in that the interests of the university are protected for a brief period of time until the

rights of the parties can be judicially determined).

**3.**

The Hernandez analysis does not resolve all of the underlying and difficult issues arising in the student transcript cases.  It provides a procedural framework for resolving the controversy without necessarily resolving the merits of the underlying legal issue generating the dispute between a debtor and a university.  That legal issue might be framed as follows: *if a university promptly files a motion for relief from the automatic stay under §362(d), seeking authority to withhold a transcript, should the motion be granted*?

In analyzing the issue through the prism of §362(d), the outcome depends on whether the university has "cause" for relief under §362(d).[28]  Of course, that statutory term does not provide explicit guidance to the courts.

> "Cause" is an intentionally broad and flexible concept which must be determined on a case-by-case basis. Indeed, there are a multitude of reported decisions discussing relief from the stay for "cause," all of which are fact intensive and generally offer no precise standards to determine when "cause" exists to successfully obtain relief from the stay. *A court may consider the policies reflected in the bankruptcy code, and the interests of the debtor, other creditors and any other interested parties. Unsecured creditors are generally entitled to relief from an automatic stay only in extraordinary circumstances*.

---

[28]      In following the analytic framework of Hernandez, I recognize that the case may hold implicitly that the fact that a debt is nondischargeable under §523(a)(8) and that, outside the bankruptcy environment, a university may, as debt collection tactic, refuse to provide a transcript upon request, is not necessarily grounds for relief from the automatic stay as a matter of law. Rather, under the Hernandez approach, the determination whether relief from stay in favor of the university is appropriate is, like other contested matters under §362(d),  a fact-driven decision left largely to the discretion of the bankruptcy court.  See generally In re Porter, 2007 WL 2084890, at *4 (Bankr. E.D. Pa. July 18, 2007) (citing In re Wilson, 116 F.3d 87, 89 (3d Cir.1997); Matter of Holtkamp, 669 F.2d 505 (7th Cir.1982); In re Shariyf, 68 B.R. 604 (E.D.Pa.1986)).

In re Brown, 311 B.R. 409, 412-13 (E.D. Pa. 2004) (emphasis added).

Hernandez provides some guidance on this issue as well, describing several inquiries that could lead a court to conclude that "cause" exists under §362(d) to warrant granting relief from the automatic stay to a party in interest.  These inquiries include:

> (1) whether the debtor is abusing the privilege of the stay;
>
> (2) whether the debtor made a good faith effort to repay the debt since its inception;
>
> (3) whether the debtor may or may not be able to make larger payments to the university to adequately protect it against the loss of its leverage of withholding the transcript;[29] and
>
> (4) whether the debtor will likely increase her earning potential through graduate school and thus, improve the university's ability to collect the debt.

2005 WL 1000059 at * 3.

---

[29]     In chapter 13 cases, query whether this factor implicates 11 U.S.C. §1322(a)(3). Compare In re Mason, 300 B.R. 379 (Bankr. D. Kan. 2003) (holding that a 56-month chapter 13 plan that proposed to pay 17% of the anticipated dividend to student loan creditors while making no distribution to other unsecured creditors "unfairly discriminates" and could not be confirmed); In re Bentley, 266 B.R. 229 (1st Cir. BAP 2001) (concluding that a plan to fully pay a student loan obligation while paying all other unsecured claims a dividend of 3% unfairly discriminated against the class of other unsecured creditors) and In re Thibodeau, 248 B.R. 699 (Bankr. D. Mass. 2000) (applying four-prong test of In re Leser, 939 F.32d 669 (8th Cir. 1991) to conclude that a 36-month plan unfairly discriminated where it proposed to fully pay student loan debt while providing only a 27% dividend on other general unsecured claims) with In re Dodds, 140 B.R. 542 (Bankr. D. Mont. 1992) (holding that plan proposing and payment of nondischargeable student loan in full outside plan according to its terms for 54 months and 79% payment to unsecured creditors over 36 months did not discriminate unfairly among unsecured class) and In re Boggan, 125 B.R. 533 (Bankr. N.D. Ill. 1991) (holding that the fresh start was a legitimate interest to discriminate in a plan whereby the debtor proposed to pay the student loan in full while paying 15% of the other unsecured claims).

-24-

**4.**

In <u>Hernandez</u>, the court entered an order giving the university a deadline either to provide

the transcript or file a motion for relief under §362(d).  The court did not provide a detailed

explanation for its decision to defer enforcement of the automatic stay in order to give the

university an opportunity to seek relief from the stay.  It appears that the disposition was an

exercise of the court's discretion and driven by its conclusion that "there was no binding

authority," <u>see</u> 2005 WL 1000059 at * 4, on the core legal issue.

I consider it appropriate to exercise my discretion differently. I will not give Penn a

reprieve from the consequences of its conduct  by providing it a further opportunity to request the

§362(d) hearing that it could have had earlier, simply because there are good faith arguments on

both sides of the merits of the underlying legal issue (<u>i.e.</u>, the scope of §362(a)).  Penn was (or

should have been) fully aware that it was engaging in a practice that is inconsistent with the plain

language of 11 U.S.C. §362(a)  –  at least according to the "majority" view of the reported court

decisions  –  and that no binding legal authority in this jurisdiction authorized its refusal to

provide the transcript that the Debtor requested.  Penn could have requested a prompt

determination of its rights under §362(a) or relief from the automatic stay under §362(d), but it

voluntarily chose not to do either.  Rather, Penn forced the Debtor to seek a determination

regarding the applicability of §362(a) and I have determined that it applies.  On this history,

neither the equities nor §362(a) bankruptcy policy favor Penn.  Regardless whether the existence

of a division in the case law might be a consideration affecting the award of damages and

attorney's fees under 11 U.S.C. §362(k), <u>but</u> <u>see</u> Part III.D., <u>infra</u>, the unsettled state of the law,

in my view, does not justify rewinding the case back to the beginning to allow Penn another

opportunity to exercise remedies that were previously available. Thus, I will not delay providing

the Debtor with a remedy for the violation of the stay.  <u>See generally</u> <u>In re Daniels</u>, 316 B.R. 342,

353 (Bankr. D. Idaho 2004) (a creditor acts at its own peril if it fails to seek judicial clarification

of the scope of the automatic stay and requires the debtor "to obtain a judicial determination of

the issues. Consequences attend that decision.").

      In exercising my discretion to proceed to the remedy phase of this case without a detour

for a potential §362(d) motion and hearing, I have considered whether this approach creates a

substantial risk of bankruptcy abuse.  In other words, if, during the hearing on the Motion, Penn

had produced evidence suggesting that the bankruptcy filing was in bad faith or abusive,

deferring the entry of an order enforcing the automatic stay pending the filing of and hearing on a

§362(d) motion may have been appropriate.  However, on the present record, I am satisfied that

in seeking to enforce her rights under §362(a), the Debtor in this case is not manipulating the

bankruptcy process or otherwise acting in bad faith.

      The Debtor did not file bankruptcy simply to obtain a transcript without payment of her

student loans or for some other inappropriate reason.  Rather, it is evident that, initially, her

primary motivation in seeking bankruptcy relief was to prevent the foreclosure of her residence

by curing a pre-petition mortgage delinquency.  Subsequently, her goal transformed and she

sought the orderly sale or surrender of her residence to satisfy the claims secured by the property

and the adjustment of the remainder of her debts through a monthly stream of payments to the

chapter 13 trustee.[30]  Thus, I find that the Debtor invoked the bankruptcy process for legitimate

---

[30]    Once the Debtor was unable to cure her mortgage default, she  attempted to satisfy
her secured creditors by filing a motion to sell the secured property, 4837 Hazel Avenue,
Philadelphia, PA, on October 26, 2006 (Docket Entry No. 34), which I granted on December 6,
2006 (Docket Entry No. 45).  Although this property ultimately never sold as planned, the
Debtor's confirmed plan provides for the surrender of the property to her mortgage creditors.

purposes.

Further, her chapter 13 plan has been confirmed.  Confirmation of the plan required two separate determinations regarding the Debtor's good faith.  See 11 U.S.C. §1325(a)(3) (chapter 13 plan shall be confirmed if "the plan has been proposed in good faith"); id. §1325(a)(7) (chapter 13 plan shall be confirmed if "the action of the debtor in filing the petition was in good faith"); see generally In re Jensen, 369 B.R. 210, 231-34 (Bankr. E.D. Pa. 2007) (discussion of the "good faith" requirement for chapter 13 plan confirmation).  In this case, the confirmation order was entered after the Chapter 13 Trustee recommended confirmation of the plan.  The trustee's recommendation satisfied the Debtor's burden of proof on the issue of her good faith in proposing the plan.  See In re Hines, 723 F.2d. 333 (3d Cir. 1983); see also Fed. R. Bankr. P. 3015(f) ("If no objection is timely filed, the court may determine that the plan has been proposed in good faith . . .  without receiving evidence on such issues").[31]

Finally, under the confirmed plan, the Debtor will pay a total of $8,650.00 over the entire three years of her plan, which the unsecured creditors will share pro rata.  In light of the Debtor's financial circumstances just prior to confirmation of her plan,[32] I have no reason to conclude that Debtor is doing anything other than making a good faith effort to treat her creditors fairly and to repay her debts to the best of her ability in this chapter 13 bankruptcy case.

In short, on the record before me, I perceive no manipulation or abuse of the bankruptcy

---

[31]     Although Penn filed an objection to confirmation, it withdrew the objection at the confirmation hearing.  For this reason alone, Penn has waived any objections it had to the good faith of the Debtor's bankruptcy filing.

[32]     See Amended Schedule I (Docket Entry No. 65) (full-time employment income of $2,550/month net for family of three (3), including two (2) minor children); Amended Schedule J - Second Amendment (Docket Entry No. 68) (average monthly expenses of $2,350).

process or a valid reason to delay granting the Debtor a remedy for violation of her rights under

11 U.S.C. §362(a) pending the disposition of an unfiled §362(d) motion.  Therefore, I will order

Penn to provide the Debtor with a certified copy of her college transcript upon payment of any

customary fees.

### D.  *The Debtor is Entitled to Damages Under 11 U.S.C. §362(k)*

The Debtor contends that she is entitled to damages under §362(k) because Penn's actions

were "willful."   The only damages requested by the Debtor are reasonable attorney's fees.

Section 362(k) provides:

> (1) Except as provided in paragraph (2), an individual injured by any
> willful violation of a stay provided by this section shall recover actual
> damages, including costs and attorneys' fees, and, in appropriate
> circumstances, may recover punitive damages.
>
> (2) If such violation is based on an action taken by an entity in the
> good faith belief that subsection (h) applies to the debtor, the recovery
> under paragraph (1) of this subsection against such entity shall be
> limited to actual damages

11 U.S.C. §362(k).  Section 362(k) was formerly codified at §362(h).   As a result of the

enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA"), Pub. L. No. 109-8, Stat. 119 Stat. 23 (2005), subsection (2) was added to §362(h)

and the provision was recodified as §362(k).

"Willful" has been defined as deliberate or intentional, In re B. Cohen & Sons Caterers,

Inc., 108 B.R. 482, 485 (E.D. Pa. 1989).  Conduct which violates the automatic stay is "willful"

if a party acts with knowledge that a bankruptcy petition has been filed.   In re Lansdale Family

Restaurants, Inc., 977 F.2d 826, 829 (3d Cir. 1992) (citing In re University Medical Center, 973

-28-

F.2d at 1087-88).  A "willful violation" does not require a finding of specific intent to violate the

automatic stay. Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337

F.3d 314, 320 n.8 (3d. Cir. 2003); In re Atlantic Business & Community Development Corp.,

901 F.2d 325, 329 (3d Cir. 1990) (citing In re Bloom, 875 F.2d 224, 227 (9th Cir. 1989)).

Rather, an action is willful if the respondent/defendant knew of the automatic stay and the

conduct that violated the automatic stay was intentional.  Krystal Cadillac-Oldsmobile GMC

Truck, Inc., 337 F.3d at 320 n.8.

In University Medical Center, the Court of Appeals recognized a limited exception to the

general standard described above for "willfulness" under §362(k) in its prior incarnation as

§362(h).  A violation of the automatic stay may not be a "willful" violation if a creditor's action

is based on persuasive legal authority indicating that his or her actions do not violate the stay and

the law on the issue is sufficiently unsettled.  973 F.2d at 1088.[33]  This principle has been

_____

[33]       In applying University Medical Center, some courts suggest the decision
established a two-prong test for the exception to apply.  See In re Montgomery Ward, LLC, 292
B.R. 49, 57 (Bankr. D. Del. 2003) (stating that University Medical Center good faith exception
applied "where (1) the law on the issue is not settled, and (2) the defendant has persuasive legal
authority indicating that his or her actions do not violate the stay"); cf. In re Mattera, 2007 WL
594908, at *7 (Bankr. D.N.J.  Feb. 21, 2007) ("Courts interpreting the exception are unclear
about whether both persuasive legal authority and legal uncertainty are required, or whether just
one suffices."); In re Hawk, 314 B.R. 312, 318 (Bankr. D.N.J. 2004) (recognizing the two-prong
interpretation of Montgomery Ward, but neglecting to resolve issue because the creditors
satisfied both prongs).  Other courts, however, have not applied University Medical Center so
mechanically.  Rather, if the creditor had a legal justification for their actions, despite those
actions being "willful," those courts denied damages.  See In re Roche, 228 B.R. 102, 104
(Bankr. M.D. Pa. 1998) (concluding no damages were assessable for the creditor's willful
violation of the stay because there "considerable amount of 'persuasive legal authority'" and that
University Medical Center found an exception "where a creditor's actions are consistent with
'contemporaneous interpretations of Section 362'"); In re Rusnak, 184 B.R. 459, 466-67 (Bankr.
E.D. Pa. 1995) (applying the University Medical Center exception to deny damages for a willful
violation of the stay where the there was an absence of case law to the contrary of the creditor's
actions and the creditor relied on the Medicare Act and other related statutes to support its
actions).

characterized as a "good faith" exception to liability for violations of the automatic stay.  See id.

at 1089 (Becker, J., dissenting)[34]

Exempting Penn from liability based on the "good faith" exception to liability articulated

in University Medical Center is certainly a plausible result, even though there are competing

interests.  On the one hand, the significance of the automatic stay in the bankruptcy system is not

debatable.  Strong policy reasons exist to put the burden on a creditor to bring automatic stay

issues to the bankruptcy court (rather than permitting the creditor to act unilaterally, thereby

compelling the debtor to seek judicial redress to enforce the stay or undo collection action).

Penn's conduct in this case occurred undeniably with knowledge of both the bankruptcy filing

and the Debtor's contention that withholding the transcript violated the automatic stay.  These

considerations militate in favor of applying only reluctantly and sparingly the "good faith

exception" to liability which may exist after a judicial determination that the automatic stay has

been violated; these considerations do not favor Penn's position.  On the other hand, the

justification that Penn offered for its conduct, that it was not a violation of the stay to withhold

the transcript, was based on respectable (i.e., persuasive) legal authority.  And, I have no

difficulty concluding that the issue involves "close and complex legal questions."  University

Medical Center, 973 F.2d at 1089.

I find it unnecessary to decide whether Penn has a defense to monetary liability under

University Medical Center.  After consideration of the BAPCPA amendment to §362(h) (now

§362(k)) enacted in 2005, I conclude that University Medical Center was "legislatively

_____

[34]        Judge Becker's dissent in University Medical Center was based on his view that
the existence of a "good faith" exception to liability under then §362(h) had been previously
rejected by the Court of Appeals in In re Atlantic Business & Community Development Corp..

overruled" by the BAPCPA and that, under current law, Penn has not stated a "good faith" defense to monetary liability in this case.

When University Medical Center was decided, there was no express, statutory good faith exception to liability for intentional actions taken in violation of the automatic stay with knowledge of the bankruptcy case set forth in then §362(h).  As a result, University Medical Center can be considered as a judicial gloss on the text of the pre-BAPCPA Code, designed to effectuate a Congressional intent that conduct with a certain type of scienter (i.e., good faith) should not be subject to the damages remedy provided in §362(h) (now §362(k)).

In enacting BAPCPA, Congress modified the Code provision addressed in University Medical Center and expressly addressed the issue of good faith.  In doing so, Congress provided for only a limited, statutory good faith exception to the §362(k) damage remedy.  The express, statutory good faith exception is more limited than the one expressed in University Medical Center in two distinct ways: (1)  the limitation applies only to good faith violations of §362(h), which relates only to action taken in the good faith belief that the automatic stay has terminated because a debtor fails to perform his or her obligations under §521(a)(2) in a timely manner;[35] and (2) it precludes only the imposition of punitive damages and in no situation restricts the imposition of  "actual damages" for willful violations of the automatic stay.

---

[35]      Section 521(a)(2) sets forth the debtor's obligation to file a "statement of intention" with respect to secured property and to perform that stated intention within thirty (30) days after the first date set for the meeting of creditors under §341.  If the debtor fails to perform timely the §521(a)(2) obligations, §362(h) provides that the stay under §362(a) "is terminated with respect to personal property of the estate or the debtor securing in whole or in part a claim, or subject to an unexpired lease . . . ." Thus, if a creditor acts with the mistaken but good faith belief that the automatic stay has terminated under §362(h), §362(k) limits a debtor's remedy to actual damages.  As stated in the text, this is now the only statutory good faith exception to liability in §362(k).

With Congress having addressed the issue of a good faith exception to §362(k) liability

expressly through the BAPCPA, the plain language of §362(k)'s exception does not  encompass

other types of arguably good faith conduct that Congress could have chosen to exempt from

liability.[36]  Given this carefully constructed exception drawn by Congress, I conclude that

University Medical Center is inconsistent with §362(k), insofar as the case held that a party is not

subject to actual damages for voluntary acts taken with knowledge of the bankruptcy case in

violation of the automatic stay when a party relies upon "persuasive legal authority" and the law

on the issue is sufficiently unsettled.  Because the standards of University Medical Center are not

applicable and §362(k) does not bar the award of actual damages based on Penn's reliance prior

reported court decisions, I find that the Debtor is entitled to the actual damages she has

requested: reasonable attorney's fees.

In reaching these conclusions regarding the scope of the "good faith" exception to

monetary liability under §362(k) and the absence of a meritorious "good faith" defense in this

---

[36]       See, e.g., U.S. v. McQuillen, 78 F.3d 105, cert. denied,  519 U.S. 826, 117 S.Ct.
89 (1996) (doctrine of inclusio unius est exclusio alterius informs court to exclude from
operation those items not included in list of elements that are given effect expressly by statutory
language).  The inclusio unius est exclusio alterius doctrine does not apply if an omitted item is
not part of a "commonly associated group or series."  See Perlin v. Hitachi Capital America
Corp., 2007 WL 2215602, at *4 (3d Cir. August 3, 2007) (enumeration of items in one
subsection of §707(a) did not exclude non-expressed items from a different subsection of §707(a)
which were enacted for different reasons).  In this case, I conclude that it is appropriate to apply
the doctrine because the excluded item (a good faith exception to liability based on intentional
action taken with knowledge of the bankruptcy case in reliance on case law) relates to the same
subject matter as the included item (good faith exception  to liability based on intentional
conduct with belief that §362(h) is applicable).  The Court of Appeals has also cautioned that the
maxim does never override "clear and contrary evidences of Congressional intent."  Abdullah v.
American Airlines, Inc., 181 F.3d 363, 373 (3d Cir. 1999) (quoting Neuberger v. Commissioner,
311 U.S. 83, 88, 61 S.Ct. 97, 101 (1940).  However, in this case, even if there were some
ambiguity in the statute that would justify consideration of legislative history, there is no
legislative history expressing clear evidence of a contrary Congressional intent.

case, I am cognizant that there is no legislative history establishing conclusively that Congress intended to circumscribe the good faith exception under §362(k) in the BAPCPA or, if so, the particular reasons it chose to do so. However, given statutory text, the absence of a "smoking gun" in the legislative history of BAPCPA is immaterial. The starting point in statutory construction is the plain language of the statute and I perceive no ambiguity in §362(k). See Hartford Underwriters Insurance Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6, 120 S.Ct. 1942 (2000); accord, Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023 (2004); United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241, 109 S.Ct. 1026 (1989); In re Price, 370 F.3d 362, 368 (3d Cir. 2004). Only if the statute is ambiguous or unclear should a court consider legislative history for interpretive guidance. Ross v. Hotel Employees and Restaurant Employees International Union, 266 F.3d 236, 245 (3d Cir. 2001).

Further, I have no difficulty concluding that the result emanating from the application of the plain language of the statute is not absurd. In creating a remedy for the violation of a fundamental legal obligation in the bankruptcy process, Congress was free to make a policy choice as to how strictly the Code should impose liability for violations of §362(a). How Congress chose to navigate the continuum between "strict liability" and a broad "good faith" exemption from monetary liability was a legislative policy choice. The circumscribed good faith exception to liability now found in §362(k) simply represents its resolution of the competing policy interests. It is not the role of the courts to modify Congress' policy decisions as expressed in the plain language of a statute. Accordingly, the statute should be applied as it is written. See Lamie, 540 U.S. at 534, 124 S.Ct. at 1030.

Since I have found that Penn violated the automatic stay and that the relief requested by the Debtor is not barred by the statutory good faith exception to the imposition of liability, I will, upon the filing of a proper motion, grant the Debtor actual damages in the form of an award of reasonable counsel fees under §362(k).[37]

## IV.

For the reasons set forth above, I will grant the Motion, order Penn to provide the Debtor with a certified copy of her college transcript upon payment of any customary fees and permit the Debtor to file a motion for allowance of her counsel fees and costs incurred in connection with the Motion.

An order consistent with this Memorandum Opinion will be entered.

Date:    September 25, 2007    _____

**ERIC L. FRANK**

**U.S. BANKRUPTCY JUDGE**

---

[37]      I note that consequences are not particularly substantial.  The Debtor seeks only reimbursement of her counsel fees for prosecuting this action.  The monetary relief initially sought by the Debtor was limited.  In the Motion itself, the Debtor requested an award of attorney's fees of only $750.00.  Unquestionably, the Debtor's counsel has done additional legal work and the Debtor has incurred additional legal fees since the filing of the Motion.  However, without prejudging the issue, based on my knowledge of and participation in the proceedings in this matter thus far and the potential number of hours that the Debtor's counsel could have reasonably expended in prosecuting this matter, I expect that the attorney's fees entitlement will be modest.

-34-

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | **Chapter 13** |
| **KAMEELAH  MU'MIN,** | : | |
| **Debtor** | : | **Bky. No. 06-12354ELF** |

## ORDER

**AND NOW,** upon consideration of the Debtor's Motion for Contempt Pursuant to 11 U.S.C. §362(k) of the Bankruptcy Code and the response thereto, and for the reasons set forth in the accompanying Opinion, it is hereby **ORDERED** that:

1.  The Debtor's Motion for Contempt of the Automatic Stay is **GRANTED**.

2.  The University of Pennsylvania shall provide the Debtor with a certified copy of the Debtor's transcript in the ordinary course upon receipt of the necessary processing fee.

3.  The Debtor may file a motion for award of counsel fees and costs incurred in connection with the Motion on or before **October 9, 2007**.

Date:    September 25, 2007          _____

                                     **ERIC L. FRANK**

                                     **U.S. BANKRUPTCY JUDGE**

**Counsel**
Jermaine Harris
Attorney for the Debtor

Andrew N. Schwartz
Attorney for the University of Pennsylvania